WELLS AND OTHERS *v.* TAYLOR AND OTHERS.

*Construction of special statute on change of county seat — Follows the general statute.*— Where a statute authorizes a special election for a change of county seat, but provides no method of holding it, the election is good if conducted according to the general law on the subject, whether the general law be or be not referred to in the special statute, and it cannot be attacked on the ground of the incompleteness of such statute, there being no charge of fraud or of illegal voting. If there is a fair vote and an honest count, the qualified voters must not be disfranchised by having the election declared void because the officers conducting the same were not duly sworn or chosen, or were not qualified for the office, or for any technical irregularity.

*Offer of public building is not bribery.*— The offer of a public building if the county seat is changed is in no sense bribery; the building is a benefit to the public and not to individuals, and the party to be influenced is a whole county.

*Failure of commissioners cannot defeat the law.*— The county seat was changed by the election, and the failure of the county commissioners to order the removal of the books of offices to the newly designated town cannot defeat the result of the election; and if the officers effect the removal on their own motion, they cannot be compelled by *mandamus* to return and await the order which the statute required the commissioners to give.

*Appeal from Jefferson County, Third Judicial District.*

ERASTUS D. EDGERTON and CHUMASERO & CHADWICK, for petitioners.

W. F. SANDERS and E. W. TOOLE, for respondents.

WADE, C. J.   This is an application filed in this court by Frank Wells, Henry B. Barkley, Edwin M. Bachelor, P. B. Clark and Charles Furgerson, citizens of Radersburg, Jefferson county, for a writ of mandate against Joel M. D. Taylor, clerk and recorder; John McDermott, sheriff; Edward McSorley, treasurer, and David G. Warner, probate judge, officers of said Jefferson county, residing and exercising the functions of their respective offices at Boulder City, in said county, to compel said officers to return the books, records, archives, papers and

effects of their several offices to Radersburg, which place, the petitioners aver, is the legal county seat of Jefferson county, and to require said officers to reside in and hold their offices at said Radersburg.

The questions to be determined arise upon a demurrer to the application of petitioners, no writ having issued in pursuance of the prayer of the petitioners, and hence no answer having been filed by the respondents. A brief statement of the facts, as they appear in the application, will be necessary in order to present the questions to be decided:

The legislative assembly of the territory, at its thirteenth regular session, 1883, passed an act authorizing the citizens of Jefferson county to vote upon the question of removing the county seat of said county from Radersburg to Boulder City, and providing the notice to be given, and the day when such election should be held. The act further provided that the county commissioners should appoint judges and clerks of said election in the several precincts as now established, who shall qualify as other clerks and judges of election, and that said judges and clerks should receive, count and make return of all legal ballots "in the manner and at the time as is provided in this bill." Also, that the canvassing board shall, within twenty days after such election, make an abstract of all the votes cast, and that the clerk of the board shall make out an abstract of the votes cast, and deliver one copy thereof to the secretary of the territory and another to the clerk and recorder of the county; that if the vote is in favor of changing the county seat, the commissioners shall, within six months from the date of the election, cause the books, records, papers and effects of the county to be removed to the place designated as the county seat; and that the several county officers thereafter shall hold and keep all county books, papers and records, and their offices, at such new county seat.

The application of petitioners charges that this act of the legislative assembly is void, for the reason that it requires the county commissioners to appoint judges and clerks of said election in the several precincts, but did not provide the number or qualifications of such judges and clerks; and because the act provided that said judges and clerks should receive, count and make return of all the legal ballots in the manner and at the time provided in the act, while the act provided neither manner nor time for receiving, counting and making return of said ballots; and for the reason that said act did not provide for a canvassing board to canvass said returns. The application further charges that the county commissioners, in pursuance of said act, appointed judges and clerks for the several precincts as then established, but that many of the persons so appointed failed, neglected or refused to serve as such, whereupon other persons assumed to act as such judges and clerks, and counted the ballots, and made and signed the returns thereof. The application specifies the particular precincts in which other persons than those appointed by the commissioners acted as judges and clerks of said election. The application further charges that the chairman of the board of county commissioners, the clerk and recorder, and the probate judge of said county, acted as a canvassing board in regard to said election, and made an abstract of the vote and filed the same as provided in said act. Said application further charges that, prior to said election, there was presented an offer to the voters of said county, in the form of a bond in the penal sum of $10,000, conditioned that, if a majority of the votes cast at said election were in favor of changing said county seat to Boulder City, and if it was so determined, then the principals in the bond agreed to furnish the county of Jefferson suitable buildings in Boulder City for a court-room, county offices, etc., free of any and all expense to said county, for the period of five years; said principals cove-

nanting and agreeing that the building for this purpose so to be provided should be of stone (giving the dimensions and number and size of the different rooms), and properly furnished for the purposes aforesaid. The application further alleges that the county commissioners made no order causing the removal of the books, records, etc., of said county from Radersburg to Boulder City, but that the county officers aforesaid, on or about the 12th day of October, 1883, removed from said Radersburg to Boulder City, taking with them the books, records, papers and effects belonging to their respective offices, and are now exercising the functions of their offices at the last-named place, and refuse to return their said offices, and the records and effects belonging thereto, to said Radersburg, to the inconvenience, damage and expense of petitioners, which is specified by proper averment.

1. There is no allegation of fraud by the petitioners. An abstract of the vote of the county at the different precincts is attached to and made a part of the application, showing that a majority of the votes as cast were in favor of changing the county seat from Radersburg to Boulder City, and there is nothing whatever in the application showing or tending to show that any illegal or fraudulent votes were cast at said election. The purpose of this act of the legislative assembly was to give to the qualified electors of Jefferson county an opportunity to express their wishes upon the question of changing their county seat from Radersburg to Boulder City, in said county. In pursuance of this purpose an election was held at the time appointed in the act. We must take it for granted that there was not a fraudulent or illegal vote cast at the election, for the petitioners charge no fraud or illegality in that regard. The vote, then, contained in the abstract attached to the application of petitioners for the writ, is an honest expression of the electors upon the question submitted. But the petitioners say that the vote was not counted or canvassed by the proper

officers; that no officers for that purpose were provided in the act; and therefore, though the vote is an honest and fair expression of the wishes of the electors of the county, that the act authorizing the vote, and the election in pursuance thereof, are void. The act does not specify the number of judges that the commissioners shall appoint at each precinct, but does provide that the commissioners shall appoint the judges and clerks, who shall qualify as other judges and clerks of election, and it does not specify who shall compose the canvassing board, but it does require *the* canvassing board to make the abstract. Who are the judges of elections? The general law specifies who they are, their number and qualifications, and how a vacancy shall be filled if any person appointed by the commissioners shall fail to serve; and, in the absence of any allegations to the contrary, the commissioners having followed the general law as to the number of judges appointed, we must presume that, in filling vacancies as to judges and clerks, the method prescribed by the general law was followed. In providing that the judges and clerks shall qualify, as other judges and clerks of election, the special act refers to the general law, and it is not too much to presume that the phrase "the judges" in the special act means the same as "the judges" in the general act, and that in appointing judges under the special act the same number should be appointed as is provided in the general election law.

The canvassing board is a board provided by the general election law. It was already in existence when this special act became a law. It was not necessary that the special act specify of whom this board should be composed, for the general law had already made such specification. If the special act had provided that the board of county commissioners should make the abstract, it would not have been necessary to have named the persons of whom such board is composed. The general law speaks upon that subject. The board of commissioners and the

canvassing board are each known to the general law, and either board being named in a special act is a sufficient designation of whom is intended. It was competent for the legislature to put this service of making an abstract of the votes at this special election upon any board or officers known to the general law, or to designate any competent person for such service. "The canvassing board" is a board known to the law, and this language in the special act in question is a definite and certain reference to such board. It was not necessary that the special act create the canvassing board, for it was already in existence, and only had to be referred to by name in order to certainly designate the persons intended to perform the services named. But if this special enactment had made no reference to the general election law, and had not provided how or in what manner the election should be held, or what officers should conduct the same, still, if an election had been held in the manner provided by the general law, in the absence of fraud or illegal voting, and the election was a fair, honest expression of the qualified electors of the county upon the question submitted to them, such enactment would be legal and such election valid. When the law authorizes a particular act to be done, but does not specify the manner of its doing, the act is well done if it follows the general law on the subject. Says Judge McCrary: "Where a statute authorizes an election to be held by a county, city or township, for the purpose of determining a·given question, and when such statute points out no mode for conducting such election, it has been held that it should be conducted in the manner prescribed by law for other elections by the same body." McCrary, Elect. (2d ed.) 353; *People* v. *Dutcher*, 56 Ill. 144.

2. In election cases the great question is whether the voice of the majority has been honestly and fairly expressed. A qualified voter should not be disfranchised because a judge of the election or a clerk was not prop-

erly appointed, or because of some technical irregularity in the returns. The question is, Was there a fair vote and an honest count? If there was, the election is valid though the officers conducting the same were not duly sworn or chosen, or did not possess the qualifications requisite for the office. "In the courts of the country the ruling has been uniform; and the validity of the acts of officers of election who are such *de facto* only, so far as they affect third persons and the public, is nowhere questioned. The doctrine that whole communities of electors may be disfranchised for the time being, and a minority candidate forced into an office because one or more of the judges of election have not been duly sworn, or were not duly chosen, or do not possess all the qualifications requisite for the office, finds no support in the decisions of our judicial tribunals." McCrary, Elect. p. 98, § 79; *People* v. *Cook*, 8 N. Y. 69; *Taylor* v. *Taylor*, 10 Minn. 107 (Gil. 81); *Baird* v. *Bank of Washington*, 11 Serg. & R. 414; *Pritchett* v *People*, 1 Gilman, 529; *People* v. *Ammons*, 5 Gilman, 107; *St. Louis Co.* v. *Sharks*, 10 Mo. 121; *Whipley* v. *McKune*, 12 Cal. 352; *People* v. *Cook*, 14 Barb. 259; *Greenleaf* v. *Low*, 2 Denio, 168; *Weeks* v. *Ellis*, 2 Barb. 324; *Keyser* v. *McKisson*, 2 Rawle, 139; *McGregor* v. *Balch*, 14 Vt. 428; *Hoffa* v. *Morter*, 82 Pa. St. 297; *Morris* v. *Valandingham*, 11 Kan. 269; *Dishon* v. *Smith*, 10 Iowa, 219.

In the last-named case the court say: "A more manifest fault is in the fact that neither the judges nor clerks of the election appear to have been sworn. In the case of each of these townships before named the officers signed a form of oath, but there is no evidence of the oath having been administered. It is urged that this defect entirely vitiates these returns. But the law is not so. While it is the law that the canvassers cannot adjudicate upon the sufficiency of returns, as we have held in the former case, where a case of this kind comes into a court of justice, such court, or a jury trying it,

not only may, but it is their duty, to look behind the returns, and even behind the ballot-box in some cases. Thus, in another case on trial upon the facts, the court might receive evidence of these officers having been sworn. And this might be the course in the present cause. But the law goes yet further. Neither the election nor the particular returns would be vitiated and subject to rejection if the above officers were not sworn. . . . The election and not the return is the foundation of the right. *Pond* v. *Negus*, 3 Mass. 230; *People* v. *Allen*, 6 Wend. 486; *Ex parte Heath*, 3 Hill, 43; *People* v. *Holley*, 12 Wend. 481; *People* v. *Peck*, 11 Wend. 604; *In re M. & H. R. Co.* 19 Wend. 143; 5 Cow. 269; *People* v. *Van Slyck*, 4 Cow. 297; *Striker* v. *Kelley*, 7 Hill, 9; *In re Strong*, 20 Pick. 484; 25 Me. 507; *Bacon* v. *York Co.* 26 Me. 491; *Brower* v. *O'Brien*, 2 Cart. (Ind.) 423."

And so we say that the *election*, and not the question as to whether the judges and clerks thereof were properly appointed, must determine whether this county seat was changed from Radersburg to Boulder City. If the election was fair and honest, and no illegal votes were cast, it is not of much consequence who counted the votes, provided they made an honest count and a correct abstract thereof.

In the case of *People* v. *Cook*, *supra*, the court say: "It is the *election*, and not the certificate of the canvassers, that gives the right to the office. . . . The neglect of the inspectors or clerks to take any oath would not have vitiated the election. It might have subjected those officers to an indictment if the neglect was wilful."

From these authorities it seems settled beyond question that mere irregularities that do not affect the general result will not vitiate an election. If the votes are legal and the voters qualified, mere irregularities in the appointment and qualification of the officers conducting the election will not have the effect to make the election void. It is not very material who counts or makes an

abstract of legal votes. These are matters merely direct-tory, unless the statute makes them mandatory. The voter is not to be disfranchised and the election held for naught because an officer not fully qualified has received or counted the votes. If the integrity of the election is not impeached, the provisions of the statute concerning the recording and receiving the legal votes cast, and the mode and manner of conducting the details of the election, are directory and not mandatory. Election laws are enacted for the purpose of securing a legal vote, and to give to qualified voters an opportunity to express their opinions. The provisions of the statute vital to this end are mandatory, and must be substantially complied with. The purpose is to secure to the voter a free, untrammeled vote, and a correct count and return thereof. Whatever is necessary to this end, and without which it cannot be attained, must be performed. Says Judge McCrary: "If the statute expressly declares any particular act to be essential to the validity of the election, or that its omission shall render the election void, all courts whose duty it is to enforce such statute must so hold, whether the particular act in question goes to the merits or affects the result of the election or not; such a statute is imper-ative, and all considerations touching its policy or im-policy must be addressed to the legislature. But if, as in most cases, the statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the actual merits of the election. *Barnes* v. *Supervisors*, 51 Miss. 305; *Wheelock's Case*, 82 Pa. St. 297. These provisions which affect the time and place of the election, and the legal qualifications of the electors, are generally of the substance of the election; while those touching the recording and return of the legal votes received, and the mode and manner of

conducting the mere details of the election, are directory. *People* v. *Schermerhorn,* 19 Barb. 540; McCrary, Elect. §§ 126, 127."

3. The petitioners further rely upon the allegations of their application, that prior to the election there was presented an offer to the voters of the county in the form of a bond, conditioned for the building a court-house at Boulder City, provided a majority of the votes cast at the election were in favor of changing the county seat of the county to that place. This offer was not bribery. A proposition of this kind, looking to the public welfare, and for the benefit of all the people alike, contains no element of criminality or immorality. The thing offered is of a public nature, pertaining to the public and not to individuals, and the party to be influenced is a whole county, and in a manner to benefit every inhabitant thereof. This is not the case of a candidate for public office, who, in order to secure votes, promises, in case he shall be elected, to donate a portion of his salary or other valuable thing to the county or state. This would be simply a proposition to purchase an office in consideration of personal services or money, or both. Such a proposition the law condemns as against sound policy, and as tending to corruption. A man who is so infirm in morals as to be willing to purchase an office would probably resort to corrupt practices in order to extort from the people the price paid. Public buildings and places to transact the public business of the people are in every county a necessity. They are provided, and rightfully, by a tax upon the whole people, for the reason that all are benefited by their erection. But if, during the pendency of an election to change a county seat, a man or company of men should erect at a certain place a court-house and county offices in order to retain the county seat at such place, could such man or company be charged with bribery or the exercise of an undue influence upon the election? Reasonable men in casting

their ballots look to the public interest and general wel-
fare. A self-governing people have the right to do in a
legal way whatever is not forbidden by the law or public
policy, for the public good. Philanthropy might erect a
public building for the use of the people. Might the
donor not give and the people accept without being guilty
of a crime? And if such gift were a court-house, and
made during the pendency of an election to remove or
change the county seat, is it possible that the people
would be guilty of a crime if, in casting their ballots,
they took into consideration the public benefits to be de-
rived from such gift? The motive which prompts the
gift is not material. If the donation promotes the pub-
lic welfare, the people, in casting their ballots, have the
right to consider it, whether the motive be good or bad.
A whole people are not bribed by the bestowal of public
benefits for the good of all alike. The law proceeds upon
the theory that a self-governing people are self-respecting,
and that whole communities will not do any act that
reflects upon their honor or integrity.

Says Woodward, J., speaking for the supreme court
of Iowa (10 Iowa, 220): "We do not think the giving
facilities for public convenience to the whole county,
such as furnishing a building for the courts and offices,
and thus relieving the county from a burden of expense,
amounts to bribery. Nor would the giving property,
though not of that specific character, but yet adapted to
reducing the expense of a change. If the people of a
town desire a county seat located at such place, there is
no wrong and no corruption in their offering and giving
facilities to produce that result. Either in buildings and
offices direct, for the use of the public, or in property or
money to procure the facilities, they may offer to take
away or to lessen the pecuniary burden which would
come upon that public, the county, by the location, or by
a change of location. And this cannot be bribery. And
it may be doubted whether such an act can become brib-

ery when the offer is to the whole county, and upon a matter of county interest only.  In a case like the present, there is no duty upon the county from which it or its citizens may be induced to swerve.  They may adopt which place they see fit, and it is offering additional inducements only to offer as above mentioned."

Says Lyon, J., for the supreme court of Wisconsin *(State* v. *Purdy,* 36 Wis. 225):  "References should be made to the cases which have sustained the validity of bids or pecuniary offers to secure the location of public buildings at some particular place.  We have no controversy with these cases here.  The distinction between the election of public officers to whom, for the time being, the exercise of the functions of sovereignty is intrusted, and the mere choice of a site for a public building, is quite apparent.  The former involves, or may involve, the integrity of the government, and the preservation of the principles upon which it is founded; while the latter is only a matter of public convenience or pecuniary interest, involving no fundamental principles whatever."

4. Boulder City became the county seat of Jefferson county, by virtue of the election.  This result could not be changed or modified by reason of the county commissioners failing to make the order contemplated by section 6 of the act, causing the books, records, papers and effects of the county to be removed to that place.  The result of elections cannot be defeated by the failure of officers to perform an act of this kind.  And Boulder City having become the county seat of the county, by virtue of the election, it follows that the application for a writ of mandate, requiring the county officers, the respondents herein, to show cause why they should not remove their offices and records to Radersburg, is insufficient to warrant the issuance of the writ, and the demurrer thereto is sustained.

Judgment for respondents accordingly.